UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

———————————————————— :
Zaire Wilson,                                        :
                                                     :
                    Plaintiff,                       :
                                                     :
          v.                                         :
                                                     :        Civil Action No. 26-13
Charles Lawson, Valdez Trower, Neil                  :
Larson, Bryan Carney, Michael Fahy,                  :        JURY TRIAL DEMANDED
Mark Johnson, Nicholas Martella, Shane               :
Getz, Matthew Dydak, Minita Little,                  :
Thomas Somogyi, Sean Jang, Breciend                  :
Burgos, Andrew Kelly, Jeffrey Gilson,                :
Vincent Nowakowski, Step Johnson (Badge              :
No. 351), James Kearney, Tracy Byard,                :
Joseph Doyle (Badge No. 547), and                    :
Thomas Walsh (Badge No. 113),                        :
                                                     :
                    Defendants.                      :
———————————————————— :

## COMPLAINT

### INTRODUCTION

1.      At sixteen, Plaintiff Zaire Wilson experienced two horrors no one—let alone a child—should endure.  First, he lost his friend, Tyshaun Welles, to gun violence.  Second, he was wrongfully arrested, prosecuted, and incarcerated for the shooting that killed his friend.

2.      Following forty-nine torturous days, Plaintiff was exonerated and released from custody, after the Philadelphia District Attorney's Office reviewed surveillance video of the incident that "shows that he was clearly not involved in the shooting and murder of Welles."[1]

---

[1] Philadelphia District Attorney's Office, *Juvenile Ordered Released After SEPTA Video Clears Him of Fatal January Shooting* (Feb. 29, 2024), https://phillyda.org/news/juvenile-ordered-released-after-septa-video-clears-him-of-fatal-january-shooting/.

3.      For nearly forty-nine days, that patently exculpatory evidence was hidden from the DAO by Defendants—police officers of the SEPTA Police Department and the Philadelphia Police Department.  These officers ignored Plaintiff's evident innocence as they investigated, arrested, and prosecuted him for a crime he did not commit, crafted and advanced a false narrative implicating Plaintiff in that crime, and concealed from prosecuting and judicial authorities and the defense the evidence that proved his innocence. Rather than follow the facts, Defendants buried them.

4.      Plaintiff now brings this suit to obtain a measure of justice for the irreversible wrongs perpetrated on him, with the hope that accountability may prevent others from experiencing the suffering he has endured.

JURISDICTION AND VENUE

5.      Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

6.      The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1343(a)(3) (civil rights).

7.      The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) to adjudicate Plaintiff's Pennsylvania pendent state law claims.

8.      Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in the Eastern District of Pennsylvania.

PARTIES

9.      Plaintiff Zaire Wilson is and at most times relevant to this Complaint was a resident of Philadelphia, Pennsylvania.  From several months between June 2024 and August 2025, Plaintiff resided in North Carolina.

10.      Defendant Charles Lawson was employed at all relevant times as a Police Inspector with the SEPTA Police Department (SPD).  He is sued in his individual capacity.

11.      Defendant Valdez Trower was employed at all relevant times as a Police Lieutenant with the SPD.  He is sued in his individual capacity.

12.      Defendant Neil Larson was employed at all relevant times as a Police Sergeant with the SPD.  He is sued in his individual capacity.

13.      Defendant Bryan Carney was employed at all relevant times as a Police Sergeant with the SPD.  He is sued in his individual capacity.

14.      Defendant Michael Fahy was employed at all relevant times as a Police Detective with the Philadelphia Police Department (PPD).  He is sued in his individual capacity.

15.      Defendant Mark Johnson was employed at all relevant times as a Police Detective with the PPD.  He is sued in his individual capacity.

16.      Defendant Nicholas Martella was employed at all relevant times as a Police Detective with the PPD.  He is sued in his individual capacity.

17.      Defendant Shane Getz was employed at all relevant times as a Police Detective with the PPD.  He is sued in his individual capacity.

18.      Defendant Matthew Dydak was employed at all relevant times as a Police Detective with the PPD.  He is sued in his individual capacity.

19.      Defendant Minita Little was employed at all relevant times as a Police Detective with the PPD.  She is sued in her individual capacity.

20.      Defendant Thomas Somogyi was employed at all relevant times as a Police Detective with the PPD.  He is sued in his individual capacity.

21.     Defendant Sean Jang was employed at all relevant times as a Police Detective with the PPD.  He is sued in his individual capacity.

22.     Defendant Breciend Burgos was employed at all relevant times as a Police Detective with the PPD.  She is sued in her individual capacity.

23.     Defendant Andrew Kelly was employed at all relevant times as a Police Detective with the PPD.  He is sued in his individual capacity.

24.     Defendant Jeffrey Gilson was employed at all relevant times as a Police Detective with the PPD.  He is sued in his individual capacity.

25.     Defendant Vincent Nowakowski was employed at all relevant times as a Police Sergeant with the PPD.  He is sued in his individual capacity.

26.     Defendant Step Johnson (Badge No. 351) was employed at all relevant times as a Police Lieutenant with the PPD.  He is sued in his individual capacity.

27.     Defendant James Kearney was employed at all relevant times as a Police Captain with the PPD.  He is sued in his individual capacity.

28.     Defendant Tracy Byard was employed at all relevant times as a Police Detective with the PPD.  He is sued in his individual capacity.

29.     Defendant Joseph Doyle (Badge No. 547) was employed at all relevant times as a Police Sergeant with the PPD.  He is sued in his individual capacity.

30.     Defendant Thomas Walsh (Badge No. 113) was employed at all relevant times as a Police Lieutenant with the PPD.  He is sued in his individual capacity.

31.     At all times relevant to this Complaint, all Defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to Plaintiff.

32.     At all times relevant to this Complaint, all Defendants acted under color of state law.

STATEMENT OF FACTS

A.    *Quadir Humphrey Shoots Plaintiff's Friend Tyshaun Welles—a Crime of Which Plaintiff Is Entirely Innocent*

33.     At approximately 8:00 PM on January 11, 2024, Level Up Philly, an afterschool program for Philadelphia youth in West Philadelphia, concluded its programming for the evening.

34.     In attendance at Level Up was a large group of youth.

35.     Among them were sixteen-year-old Plaintiff Zaire Wilson, Plaintiff's twin brother, and Plaintiff's friend, Tyshaun Welles.

36.     After Level Up's activities ended, Plaintiff, Welles, and dozens of others from the program went to the 46th Street stop of Southeastern Pennsylvania Transportation Authority's (SEPTA) Market-Frankford Line (MFL), where they waited on and boarded an eastbound train towards City Hall.

37.     For his part, Plaintiff was headed to the Broad Street Line (BSL), which he planned to ride home to West Oak Lane.

38.     Plaintiff, still with a large group of Level Up participants, got off the Market-Frankford Line at the City Hall stop, where he could transfer to the BSL.

39.     Inside and nearby the City Hall station, Plaintiff hung out with the other Level Up participants.  They were closely monitored—and practically accompanied—by uniformed police from SEPTA Police Department (SPD) when they were inside the City Hall station, and the Philadelphia Police Department (PPD) when they were outside the City Hall station.

40.    At approximately 9:15 PM, Plaintiff, with several dozen of his fellow Level Up participants, went to the westbound platform of the MFL, with the intention of socializing before transferring to the BSL to go home.

41.    As they descended the staircase to the platform, five uniformed SPD officers followed, all of them just a few steps behind Plaintiff.

42.    For the next ten minutes, Plaintiff amicably talked to and engaged in horse play with other Level Up participants, including his brother, on the MFL westbound platform, while the uniformed SPD officers, also on the platform, visibly monitored them just feet away.

43.    At no point did these SPD officers intervene in the children's play, as it was evidently good natured.

44.    At approximately 9:20 PM, sixteen-year-old Quadir Humphrey, who was not at Level Up that evening, arrived at City Hall station alone, having traveled there on the BSL from the North Philadelphia station.

45.    Humphrey wore a surgical mask that covered his face, except his eyes.

46.    Alone still, Humphrey descended a staircase onto the westbound platform of the MFL at approximately 9:23 PM.

47.    Humphrey stayed on the far east end of the westbound platform, many feet away from the Level Up crowd, including Plaintiff.  He did not interact with anyone from that crowd.

48.    Humphrey left the westbound platform alone moments later, descending the same staircase to a lower level, before reascending the stairs and reentering the westbound platform seconds after the clock struck 9:24 PM.

49.     He stayed on the far east end of the platform, many feet away from the Level Up crowd, including Plaintiff, continuing to not interact with anyone and not coming within view of the uniformed SPD officers monitoring the Level Up group.

50.     At 9:25:15 PM, Plaintiff was horseplaying with a girl he had been playing with over the prior minutes, and he chased her past his brother as she ran to the far east end of the platform, where they continued to horseplay.

51.     They stopped playing seconds later when they encountered Humphrey, whom Plaintiff had met at school and spoken to once before.  Plaintiff and the girl both approached and greeted Humphrey at 9:25:30, with at least five SPD in view nearby on the platform.

52.     Unbeknownst to Plaintiff, Humphrey was carrying a handgun, entirely concealed from view in his waistband under his large winter coat.

53.     Plaintiff and Humphrey interacted for about twenty seconds, making small talk and walking on the east end of the westbound platform, while Plaintiff was wearing his winter coat halfway on both of his arms, with the collar resting halfway down his back.

54.     Meanwhile, Plaintiff's brother, along with other Level Up participants with whom Plaintiff was friendly, walked towards the east end of the platform where Plaintiff and Humphrey were talking.

55.     The girl with whom Plaintiff was horseplaying walked towards Plaintiff's brother and the others with him and began talking with them.

56.     Simultaneously, still with his winter coat halfway off both of his arms, Plaintiff started walking back towards his brother and the children with him, and back towards the uniformed SEPTA Police closer to the middle of the platform.

57.     Humphrey, a few feet from Plaintiff's left side, also began walking towards Plaintiff's brother and his friends.

58.     At 9:26:00, while a noisy westbound train was arriving at the platform, Humphrey then slowed down his pace, putting himself several steps behind Plaintiff and concealing himself by placing the right side of his body behind the left side of Plaintiff's back.

59.     At 9:26:02, while behind Plaintiff, Humphrey pulled up his jacket, drew the firearm from his waistband with his left hand and kept it bladed at his side, hidden from Plaintiff's view.

60.     Humphrey briskly pushed past Plaintiff, walking several quick steps briskly towards Plaintiff's brother and his friends.

61.     At 9:26:03, while about five to ten feet ahead of Plaintiff, Humphrey quickly raised his left arm, pointed the gun westward, and began firing at the crowd in the direction of Plaintiff's brother, who was the closest person to Humphrey, as well as Plaintiff's friends and the girl with whom Plaintiff had been horseplaying moments earlier.

62.     As soon as Humphrey started shooting, Plaintiff, still behind Humphrey, jumped back in fright and shock, and immediately began running for cover away from the scene, in the opposite direction from which Humphrey was firing.

63.     Humphrey continued to fire multiple shots towards Plaintiff's brother as Plaintiff ran for cover, darting up a staircase at the east end of the westbound MFL platform.

64.     At 9:26:07, Humphrey stopped firing and fled the scene, brandishing the gun in his left hand and running down the staircase that Plaintiff had just run up.

65.     As a result of Humphrey's actions—and, clearly, Humphrey's actions alone—Tyshaun Welles suffered a gunshot wound to the head.[2]

66.     Plainly, Plaintiff had no idea that Humphrey was going to shoot at anyone, let alone his own brother.  Plaintiff did not know Humphrey had a gun, let alone that he would use it.  And Plaintiff did not have a gun, let alone brandish or fire one.

67.     Further underscoring his innocence, Plaintiff—visibly distressed and with his jacket still half off—descended the staircase he had gone up to take cover and returned to the scene just ten seconds after Humphrey stopped shooting.

68.     At that time, several uniformed SPD officers—two of whom were monitoring Plaintiff and the Level Up crowd on the platform before the shooting—rushed up to Plaintiff with their guns pointed at him, ordering him to the ground.

69.     With his hands up and appearing genuinely terrified, Plaintiff complied with the officers' orders, while repeatedly asserting his innocence.

70.     The officers detained him on the ground, frisked him, and searched him.

71.     Demanding Plaintiff show them the gun, Plaintiff truthfully denied having a gun.

72.     Those denials were quickly verified.  Because he was innocent, the officers found no evidence of a crime, let alone his involvement in the shooting, so they released him after an approximately minute-long detention.

73.     Now, one minute after the shooting occurred, Plaintiff did not flee the scene, but instead remained at the location of the shooting, walking west on the platform towards the spot where Welles was hit.

---

[2] Uniformed SEPTA officers, including some who were already on scene monitoring the Level Up group, rushed Welles to an ambulance, which then transported him to Thomas Jefferson Hospital.

74.     Just feet away from where Welles was shot, Plaintiff reconnected with his brother and their friends, all of whom were in the line of—but fortunately spared physically by—Humphrey's fire.

75.     Plaintiff's brother and their friends told Plaintiff that Welles had been shot and taken from the scene, and, together, they ran upstairs off the westbound platform to find their ailing friend.

76.     Some three minutes later, Plaintiff—alone, visibly distressed and upset, and still wearing the same jacket in the same way—came back down the same staircase right onto the westbound MFL platform just steps away from where Welles had been shot, and where uniformed SPD officers were actively searching for the shooter among the crowd and had stopped the westbound train.

77.     About one minute later, while Plaintiff was walking on the westbound platform as uniformed SPD officers continued their search next to him, Plaintiff's brother, and his friend—both of whom Humphrey nearly shot—came down the same stairs to the westbound platform and reconnected with Plaintiff.

78.     Apparently at the urging of uniformed SPD officers, Plaintiff, his brother, and their friend exited the westbound platform up a different staircase.

79.     Distraught about his friend Welles' shooting, Plaintiff had a panic attack, cried profusely, and threw off his jacket.

80.     Friends picked up his jacket, tried to console and calm him down, and told him to walk it off, prompting him to walk to the eastbound MFL platform to try to soothe himself.

81.     Whereas Plaintiff acted in a manner that underscored his innocence after the shooting, Humphrey did the opposite: fleeing from the scene immediately after he stopped shooting and not returning, stashing his gun and the heavy winter jacket he used to conceal it.

82.     Indeed, two minutes after the shooting, uniformed SPD officers stopped and searched Humphrey in a different part of City Hall station—a concourse with no one else around, which was close to an exit to the street, and close to where he stashed the gun and winter coat. Humphrey lied to the officers, stating that he had just arrived at the station.

83.     Because Humphrey had already discarded the gun, the search yielded no results, and the officers released him.

B.    *Ignoring and Concealing the Clear Evidence of Plaintiff's Innocence, and Misrepresenting Evidence to Imply His Guilt, Defendants Unlawfully Detain, Arrest, and Prosecute Plaintiff for Welles' Shooting*

84.     Seconds after the shooting, uniformed SPD police at the scene communicated over police radio the fact that a shooting had occurred on the eastern end of the westbound MFL platform.

85.     Under the direction of Defendant SPD Inspector Charles Lawson and Defendant SPD Lieutenant Valdez Trower, Defendants SPD Sergeants Neil Larson and Bryan Carney—whose tasks included monitoring SEPTA surveillance cameras in real time to inform the actions of SEPTA police patrol officers—immediately began reviewing video footage from surveillance cameras at the scene to investigate the shooting and provide descriptions of the suspect to police on patrol to aid them in identifying and apprehending the perpetrator.

86.     As Police Inspector, Lawson was second in command to the SPD's Chief of Police. In that role, he was responsible for commanding and directing the activities of SPD's patrol

division—including all the other Defendant SPD officers in this case—and developing SPD's policies and procedures.

87.    As the police on patrol searched for the perpetrator, Defendants Larson and Carney, under the direction of Defendants Lawson and Trower, continued to review surveillance footage from the scene, from other areas in the City Hall SEPTA station, and from the MFL's 46th Street station, knowing that the shooting had involved the Level Up group that had traveled from 46th Street station to City Hall station.

88.    The footage that Defendants Larson and Carney reviewed depicted what is described above concerning the events leading up to the shooting: Quadir Humphrey—and Humphrey alone—possessed and shot a firearm, and Plaintiff was innocent.

89.    Nonetheless, despite knowing Plaintiff was innocent, Defendants Larson and Carney, with the approval of and at the direction of Defendants Lawson and Trower, sent via e-mail to all SPD personnel approximately ten minutes after the shooting a screenshot of Plaintiff and Humphrey, depicting Plaintiff next to Humphrey approximately 30 seconds before the shooting occurred and falsely implicating Plaintiff as a suspect.

90.    Defendants Larson and Carney, with the approval of and at the direction of Defendants Lawson and Trower, disseminated this screenshot falsely implicating Plaintiff as a suspect despite having observed their colleagues detain and search Plaintiff seconds after the shooting when Plaintiff returned to the scene, find no gun or other incriminating evidence, and release him.

91.    Because, as described above, Plaintiff was innocent, this screenshot did not depict Plaintiff committing any crime; nor did it depict Humphrey visibly displaying a firearm or otherwise provide any reason to believe Plaintiff knew Humphrey was armed.

92.    Alerted to the screenshot e-mail via SEPTA police radio, SPD officers on the scene of the shooting opened their e-mail and viewed the screenshot.

93.    Knowing there was only one shooter, some officers on the scene expressed confusion, and at least one asked Defendants Carney and Larson over police radio which of the two people depicted was the shooter.

94.    Responding over police radio, Defendants Carney and Larson, with the approval of Defendants Lawson and Trower, correctly identified the shooter depicted in the screenshot as the child who would later be identified as Humphrey.

95.    However, again with the approval of Defendants Lawson and Trower, Carney and Larson then identified Plaintiff over police radio as Humphrey's accomplice.

96.    Equipped with this false implication of Plaintiff and the correct implication of Humphrey, SPD personnel on patrol in and around City Hall station began to search for Plaintiff.

97.    At 9:34 PM, Defendant Trower began walking from SPD headquarters at 1234 Market Street to the nearby scene to supervise the investigation in person.  During this on-scene supervision, he was in regular phone contact with his supervisor, Defendant Lawson, and regular radio and phone contact with his supervisees, Defendants Carney and Larson.

98.    Approximately two minutes after Defendants Larson and Carney disseminated the screenshot, SPD officers stopped Humphrey for the second time, in the same deserted area where they had stopped him just after the shooting.

99.    As the officers used the screenshot to verify his identity, Humphrey attempted to flee and physically resisted arrest, prompting one officer to tase him.  Once he was subdued, the officers cuffed him, brought him to the street, and locked him in the back of a police wagon.

100.    Whereas Humphrey's conduct leading to his arrest evinced his consciousness of guilt, Plaintiff's conduct in the moments leading to his arrest betrayed his consciousness of innocence.

101.    Indeed, Plaintiff was not arrested in a deserted corner of City Hall station, but while he was standing on the eastbound MFL platform directly across from the crime scene trying to calm himself down, approximately six minutes after the screenshot was disseminated, in full view of a large number of uniformed SEPTA police—including at least two of the officers who had stopped and searched him when he had returned to the scene moments after the shooting.

102.    Reviewing the screenshot, one of those officers spotted Plaintiff on the eastbound platform, announced his discovery to the other officers, and at 9:42:45, ran over to the eastbound platform, where he stopped Plaintiff, who was visibly bewildered and entirely compliant.  A group of uniformed SEPTA officers cuffed Plaintiff, brought him to the street, and locked him alone in the back of a police wagon.

103.    At approximately 10:00 PM, the PPD's Shooting Investigation Group (SIG) and Homicide Unit were assigned to investigate concurrently with SPD.

104.    Unless and until Welles passed, SIG would lead the PPD's investigation and be responsible for presenting any criminal charges from the incident to the prosecuting authority—the Philadelphia District Attorney's Office (DAO)—for approval.

105.    If Welles passed, the PPD's Homicide Unit would assume responsibility for conducting the investigation and presenting charges to the DAO for approval.

106.    Assigned to lead the investigation from SIG were Defendant Detectives Michael Fahy and Mark Johnson.  They collaborated closely with Defendant SIG Detectives Nicholas Martella, Shane Getz, Matthey Dydak, Minita Little, Thomas Somogyi, Sean Jang, Breciend

Burgos, Andrew Kelly, and Jeffrey Gilson.  And the team's investigation and activities were supervised and directed by Defendant SIG Sergeant Vincent Nowakowski, Lieutenant Step Johnson (Badge No. 351), and Captain James Kearney.  (Collectively, Plaintiff will reference these Defendants as the SIG Defendants.)

107.    Assigned to lead the investigation from the Homicide Unit was Defendant Detective Tracy Byard, whose investigation and activities were supervised and directed by Defendants Lieutenant Thomas Walsh (Badge No. 113) and Sergeant Joseph Doyle (Badge No. 547).

108.    On information and belief, when SIG and the Homicide Unit were assigned, their officers—the above-listed Defendants—were briefed on the incident and the progress of the investigation, as detailed above.

109.    At approximately 10:15 PM, approximately thirty minutes after Plaintiff was arrested, members of the SIG team arrived on scene, where they continued their investigation and coordinated with SPD.

110.    Soon thereafter, SPD officers located Humphrey's gun and winter coat stashed behind a locked gate not far from where Humphrey was stopped.

111.    At around the same time, Defendant Trower, in consultation with Defendants Carney, Larson, and Lawson, developed an identification process for Plaintiff and Humphrey.

112.    That process would involve Defendant Carney conducting a FaceTime video call with SEPTA Police Sergeant John Carroll-Brown. Officers would then remove Plaintiff and Humphrey from the wagons and display them to Defendant Carney via the camera on Sergeant Carroll-Brown's phone.  With Defendant Carney on FaceTime facing Sergeant Carroll-Brown's

own Body-Worn Camera, Sergeant Carroll-Brown would capture Defendant Carney making the identification in real time.

113.    Defendant Carney and Sergeant Carroll-Brown began that identification process at approximately 10:21 PM, nearly an hour after the shooting.

114.    At approximately 10:21, Defendant Carney identified Humphrey as the shooter, stating "that's definitely him."

115.    At approximately 10:22, as Sergeant Carroll-Brown walked to the police van holding Plaintiff and still on FaceTime with Defendant Carney, Defendant Carney displayed on his side of the video call the screenshot he and Defendant Larson had disseminated.

116.    Profoundly mischaracterizing what the surveillance footage depicted and omitting the many exculpatory facts detailed above, and doing so knowingly or at least recklessly, Defendant Carney told Sergeant Carroll-Brown that Plaintiff was "definitely involved somehow in" the shooting, because Plaintiff was walking with Humphrey, looking down the platform, and was "right next to" Humphrey "when the shooting went down."

117.    Officers then removed Plaintiff, in cuffs, from the back of the van. Mischaracterizing the facts again, and doing so knowingly or at least recklessly, Defendant Carney identified Plaintiff by stating that he was "definitely the kid that was with him," adding that Plaintiff "was walking with him [Humphrey] when he pulled out the gun and shot down the platform—he was walking with him—so he definitely was with him [Humphrey]."

118.    Sergeant Carroll-Brown communicated the fact that Defendant Carney had identified Humphrey and Plaintiff over SPD radio.

119.    At approximately 10:25 PM, Defendant Trower called Defendant Lawson. During the call, Defendant Trower relayed the identification update to Defendant Lawson and

confirmed that "we do definitely have the shooter" and indicated that Defendant Carney was able to identify him via video.

120.    In stark contrast, Defendant Trower expressed uncertainty and clear doubt to Defendant Lawson about Plaintiff's involvement.  He told Defendant Lawson he could not say if Plaintiff "was in the area or was just part of it or what the deal was with that."  Responding to an inaudible comment from Defendant Lawson, Defendant Trower said, "Yea.  That's what it looked like to me, but nothing was handed off to him.  I would've thought that if he was part of it he would've taken the gun and walked off.  But he didn't take nothing."

121.    Nonetheless, neither Defendant Trower nor Defendant Lawson authorized Plaintiff's release.  Thus, despite knowing that Plaintiff was innocent, Defendant Trower and Defendant Lawson permitted him to remain in custody for a shooting he did not commit.

122.    Defendant Trower described the identification process to the SIG Defendants on scene, including Defendant Lieutenant Johnson (Badge No. 351).

123.    The SIG Defendants, including Defendant Lieutenant Johnson (Badge No. 351), indicated to Defendant Trower that they would need the SPD personnel who watched the surveillance footage to disclose all video to SIG for charging purposes, that they would need to interview Defendant Carney because he made the identifications, and identified other SPD personnel SIG would need to interview.

124.    Defendant Lieutenant Johnson (Badge No. 351) then spoke directly with Defendant Carney, who, on information and belief, described the above-detailed identification process to Defendant Lieutenant Johnson, including his plainly inadequate and factually flawed basis for believing Plaintiff was involved in the shooting.

125.    At the direction of Defendants Lawson and Trower, Defendant Larson instructed the various SPD personnel whom SIG needed to interview about the shooting—including Defendant Carney and the officers who apprehended Humphrey and Plaintiff and the officer who recovered Humphrey's firearm and jacket—to travel to SIG's headquarters, located in PPD's headquarters.

126.    At 10:37 PM, before Plaintiff and Humphrey were transported to the Police Detention Unit (PDU) at PPD headquarters, Plaintiff's mother approached the corner of 15th and Market Streets, where Plaintiff was being held in a police van, and, while asserting Plaintiff's innocence, she asked SPD personnel if she could speak with a supervisor.

127.    Defendant Trower responded to the scene several minutes later and spoke with Plaintiff's mother, who said Plaintiff's brother had called her and told her Plaintiff was under arrest. After confirming that Plaintiff was under arrest, Defendant Trower falsely told Plaintiff's mother that Plaintiff was the shooter, they saw him with a gun, and that video depicted Plaintiff shooting and possessing a gun. Plaintiff's mother expressed plain disbelief in these assertions and asked to see the video—a request Defendant Trower denied. And Plaintiff's mother told Defendant Trower that the shooting victim was Plaintiff's friend.

128.    Several minutes later, Plaintiff and Humphrey were transported to PDU, where they were detained in holding cells while SIG conducted further investigation, which included, among other things, interviewing SPD personnel and reviewing SEPTA surveillance footage of and related to the shooting.

129.    Defendant SIG Detective Andrew Kelly interviewed Defendant Carney at approximately 11:45 PM on January 11, 2024.

130.    During that interview, Defendant Carney confirmed that he had recovered comprehensive SEPTA surveillance footage depicting the shooting as well as the leadup to the shooting and its aftermath, that he had provided copies of that footage to SIG via Defendant Kelly, and that Defendant Kelly had uploaded the footage to SIG's files.

131.    Defendant Carney confirmed as well that he and Defendant Kelly had watched this footage together prior to the interview.

132.    The footage they reviewed depicted Humphrey's plain guilt and Plaintiff's evident innocence, as described above.

133.    After Defendant Carney identified Humphrey as the shooter on printed screenshots of two of the surveillance cameras, Defendant Kelly asked Defendant Carney if Plaintiff—"the other male" Humphrey "was with"—"had any role in the shooting that you know of."

134.    In response, Defendant Carney once again seriously mischaracterized the surveillance footage and omitted the many exculpatory facts it depicted, as detailed above.

135.    Defendant Carney falsely claimed that Plaintiff knew Humphrey had a gun, that Plaintiff stood right beside and with Humphrey while he pulled out a gun, and that Plaintiff watched him fire and did not turn around and run or otherwise try to get away.  Carney emphasized to Kelly that Plaintiff was standing with Humphrey while he was shooting as if he knew it was coming.

136.    Defendant Kelly falsely described Plaintiff as Humphrey's accomplice. Defendant Carney agreed that Plaintiff was "absolutely" an accomplice, again falsely emphasizing that Plaintiff didn't move, run, or hide when the shooting started, and falsely describing Plaintiff

as being "there with [Humphrey] as he was doing the shooting." Defendant Carney told Defendant Kelly that based on the videos, he believed Humphrey and Plaintiff were together.

137.    Having reviewed the video footage that exculpated Plaintiff himself, Defendant Kelly knew or at least recklessly disregarded the fact that Defendant Carney had falsely implicated Plaintiff in the Welles shooting.

138.    Defendant Kelly shared Defendant Carney's interview with the other SIG Defendants.

139.    Defendants Fahy and Mark Johnson—the SIG Defendants assigned to lead the investigation—and Defendants Lt. Johnson (Badge No. 351) and Nowakowski—the SIG Defendants who directly supervised Fahy and Mark Johnson—reviewed Defendant Kelly's interview of Defendant Carney. On information and belief, the other SIG Defendants did as well.

140.    Having reviewed the video footage that exculpated Plaintiff themselves, Defendants Fahy, Mark Johnson, Nowakowski, and Lt. Johnson (Badge No. 351) knew or at least recklessly disregarded the fact that Defendant Carney had falsely implicated Plaintiff in the Welles shooting. On information and belief, the remaining SIG Defendants also reviewed the video footage that exculpated Plaintiff.

141.    Nonetheless, knowing or at least recklessly disregarding the fact that Plaintiff was innocent, the SIG Defendants collectively agreed to advance charges of criminal conspiracy, aggravated assault, simple assault, and recklessly endangering another person against Plaintiff for Welles' shooting.

142.    Defendant Fahy drafted the Philadelphia Police Department Arrest Report (PARS) for Plaintiff, which contained a detailed summary of the SPD and SIG allegations against Plaintiff, and would, per procedure, be the main vehicle by which the SIG Defendants presented

the charges against Plaintiff to the prosecuting authority—the Philadelphia District Attorney's Office (DAO)—for approval.

143.    Defendants Johnson, Nowakowski, and Lt. Johnson (Badge No. 351) reviewed and approved Defendant Fahy's PARS, as did—on information and belief—the other SIG Defendants.

144.    This PARS presented a distorted version of Welles' shooting that falsely implicated Plaintiff by misrepresenting and mischaracterizing the facts and omitting crucial exculpatory facts.    Drawn from the exculpatory surveillance footage, a sample of those misrepresentations and omissions follows.

    a.    The PARS omits the fact that Plaintiff's brief encounter with Humphrey before the shooting was evidently a product of happenstance, stemming from a girl with whom Plaintiff was horseplaying running towards the end of the platform where Humphrey was, and Plaintiff following her. *See, e.g.*, ¶¶ 50–51, *supra*.

    b.    The PARS misleadingly states that Humphrey and Plaintiff had "a conversation off to the side" before Humphrey "walk[ed] toward the track area, pull[ed] out a gun and start[ed] shooting," while omitting the full circumstances of Plaintiff's encounter and interaction with Humphrey before the shooting (*see, e.g.*, ¶¶ 50–62, *supra*), which demonstrate Plaintiff's innocence.

    c.    The PARS falsely states that Humphrey and Plaintiff fled together after the incident.    In reality, Plaintiff did not flee with Humphrey—let alone at all. Instead, he began running away from the scene as soon as Humphrey began

firing his weapon; Humphrey fired multiple additional shots after Plaintiff had run away; and when Humphrey stopped firing, he ran in a different direction than Plaintiff. *See, e.g.*, ¶¶ 62–64, *supra*.

d.    The PARS omits that Plaintiff did not take the gun from Humphrey or otherwise do anything to indicate any involvement in Humphrey's crime, which, as Defendant Trower reflected, was probative of Plaintiff's innocence. *See, e.g.*, ¶¶ 121 & 40–83, *supra*.

e.    The PARS omits that Plaintiff returned to the scene of the shooting just ten seconds after Humphrey stopped shooting and fled the scene. *See, e.g.*, ¶ 67, *supra*.

f.    The PARS omits that when he returned to the scene seconds after the shooting ceased, Plaintiff was immediately stopped (while appearing genuinely terrified and repeatedly proclaiming his innocence), searched, and released. *See, e.g.*, ¶¶ 67–72, *supra*.

g.    The PARS omits that after he was released, Plaintiff walked even closer to where Welles was shot and connected amicably and walked up the staircase with some of the people Humphrey was firing at. *See, e.g.*, ¶¶ 73–75, *supra*.

h.    The PARS omits that three minutes later, Plaintiff returned to the westbound platform, where uniformed SPD officers were actively searching for the shooter. *See, e.g.*, ¶ 76, *supra*.

145.    At the direction and with the approval of Defendants Lt. Johnson (Badge No. 351) and Nowakowski—and, on information and belief, the approval of Defendant Capt. Kearney and the agreement of the other SIG Defendants—Defendants Fahy and Defendant Mark Johnson

transmitted the distorted, misleading, and falsehood-laden PARS to the DAO on or about January 12, 2024, but they concealed the video footage from the DAO.

146.    No Defendant disclosed this exculpatory footage to the DAO.

147.    Deprived of this powerful exculpatory evidence, and relying on the botched PARS, the DAO approved the charging Plaintiff as SIG requested on January 12, 2024.

148.    Plaintiff was arraigned on these charges in the afternoon of January 12, 2024, and his bail was set at $150,000.  Because he could not pay his bail, he was incarcerated at the Juvenile Justice Services Center (JJSC) pending trial.

149.    Around the same time as Plaintiff was arraigned, SPD Defendant Lawson conducted a news conference on the shooting.  During that news conference, Defendant Lawson falsely stated that Plaintiff had a criminal history, in an effort to justify prosecuting Plaintiff for a crime he did not commit.  Until Plaintiff was wrongfully arrested for Welles' shooting, Plaintiff had never been arrested, as Defendant Lawson knew or recklessly failed to learn.

150.    Also during that news conference, SPD Defendant Lawson said that SPD officers were "pouring through video" related to the incident—an implicit confession that Defendants had failed to carefully review the evidence that demonstrated Plaintiff's innocence before arresting him and procuring his wrongful prosecution.

151.    On information and belief, the officers reviewing the video Defendant Lawson referenced included Defendants Lawson, Trower, Carney, and Larson, and that review yielded additional evidence exculpating Plaintiff, which was shared with the SIG Defendants but concealed from the DAO.

152.     Despite mounting evidence of Plaintiff's innocence, neither the SPD Defendants nor the SIG Defendants took any action to advocate that the false charges against Plaintiff be withdrawn.

153.     At 3:50 PM on January 16, 2024, Welles died.

154.     As a result, the PPD Homicide Unit took over the investigation.

155.     Supervised by Defendants Lt. Walsh (Badge No. 113) and Sgt. Doyle (Badge No. 547), Defendant Byard received and reviewed the entire case files SPD and SIG had developed, including the video evidence that demonstrated Plaintiff's innocence.

156.     On information and belief, Defendants Walsh and Doyle also reviewed that exculpatory video evidence.

157.     Despite knowing that Plaintiff was innocent, or at least recklessly disregarding that reality, Defendant Byard copied and pasted SIG's false, misleading, and incomplete narrative implicating Plaintiff in Welles' shooting into an Affidavit of Probable Cause (AOPC) for Plaintiff's arrest on homicide and weapons charges.

158.     Further, Defendant Byard used SIG's false, misleading, and incomplete narrative, knowing or at least consciously disregarding the risk that it was false, misleading, and incomplete.

159.      After Defendants Walsh and Doyle signed off on Byard's AOPC, it was transmitted to the DAO for approval of the new charges.

160.     Not transmitted, however, was the exculpatory video footage.

161.     Deprived of this powerful exculpatory evidence, and relying on the misleading AOPC, the DAO approved charging Plaintiff as the Homicide Unit requested on January 19, 2024.

162.     That same day, Defendant Byard swore to and affirmed the AOPC before a magistrate to secure an arrest warrant for Plaintiff's arrest on homicide and related charges.

163.    As with the DAO, Defendant Byard concealed from the magistrate the fact that Plaintiff was innocent and that video footage demonstrated his innocence.

164.    Deprived of this powerful exculpatory evidence, and relying on the misleading AOPC, the magistrate issued the arrest warrant on January 19, 2024.

165.    On January 23, 2024, Plaintiff was arrested, arraigned, and ordered held without bail for Welles' homicide and the new gun charges.

166.    Consequently, at the tender age of sixteen, Plaintiff was forced to confront an unspeakable horror: spending the rest of his life locked in a cage for a crime he did not commit, let alone a crime that took his friend's life.

C.    *Humphrey Confesses and Excludes Plaintiff, Defendants Disclose the Exculpatory Footage to the DAO, and Plaintiff Is Exonerated and Released*

167.    While Defendants were working to prosecute and incarcerate Plaintiff despite his evident innocence, including by concealing the video footage that would exonerate Plaintiff, Humphrey—admirably and against his own self-interest—was working to clear Plaintiff's name.

168.    While Humphrey was incarcerated at the JJSC awaiting trial for shooting Welles, he told multiple JJSC staffers that "Mr. Wilson [Plaintiff] had nothing to do with it."

169.    Humphrey even wrote and signed a letter exonerating Plaintiff to a judge.  Dated January 16, 2024, that letter read, "Dear Judge, the person I was arrested and detained with has no connection whatsoever.  I don't know him nor does he know me."

170.    On or about February 26, 2024, Defendants finally disclosed the exculpatory video footage to the DAO.

171.    The DAO properly concluded that "[t]he SEPTA surveillance video of the incident . . . shows that [Plaintiff] was clearly not involved in the shooting and murder of Welles."[3]

172.    Based on that video and, on information and belief, Humphrey's above statements, the DAO further correctly determined "that Humphrey acted alone on January 11th when he allegedly began firing into a crowd of mostly young people, striking Welles, on the platform of the 15th Street station."[4]

173.    On February 28, 2024, the DAO requested a hearing to withdraw charges against Plaintiff.

174.    On February 29, 2024, the DAO successfully moved to withdraw those charges.

175.    Plaintiff was released from custody the same day, ending a forty-nine-day nightmare he should never have endured.

D.    *Damages*

176.    The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the individual Defendants caused Plaintiff to be improperly arrested and imprisoned, unfairly and wrongfully prosecuted, and forced to serve 49 days in prison for a crime he did not commit.

177.    As a direct result of Defendants' conduct and omissions, Plaintiff sustained injuries and damages, including loss of freedom and precious days of youth, pain and suffering, mental anguish, emotional distress, indignities, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom (including diet,

---

[3] Philadelphia District Attorney's Office, *Juvenile Ordered Released After SEPTA Video Clears Him of Fatal January Shooting* (Feb. 29, 2024), https://phillyda.org/news/juvenile-ordered-released-after-septa-video-clears-him-of-fatal-january-shooting/.
[4] *Id*.

sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression).

178. As a direct result of Defendants' conduct and omissions, Plaintiff:

    a. Was deprived of his familial relationships, romantic relationships, and friendships;

    b. Sustained and continues to sustain economic injuries and damages, including loss of income and loss of educational and career opportunities; and

    c. Sustained physical injuries, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

CAUSES OF ACTION[5]

## COUNT I
**42 U.S.C. § 1983: Unlawful Seizure in Violation of the Fourth Amendment**
(against all individual defendants)

179. Plaintiff incorporates the preceding paragraphs by reference.

180. Defendants, acting individually and in concert, intentionally stopped, frisked, searched, handcuffed, placed into police custody, arrested, and detained Plaintiff.

181. Those acts subjected Plaintiff to seizures.

182. The seizures were unreasonable because they were conducted without reasonable suspicion or probable cause.

183. These seizures injured Plaintiff.

---

[5] All paragraphs pled below are incorporated into the above statement of facts.

184.    Defendants' acts and omissions in this regard were the direct and proximate cause of Plaintiff's injuries.

185.    Defendants performed the above-described acts under color of state law intentionally, with reckless disregard for the truth, and with deliberate indifference to Plaintiff's clearly established constitutional rights.  No reasonable officer would have believed this conduct was lawful.

## COUNT II
**42 U.S.C. § 1983: Unlawful Arrest Based on an Illegally Procured Warrant in Violation of the Fourth Amendment** (against all individual defendants)

186.    Plaintiff incorporates the preceding paragraphs by reference.

187.    Defendants, acting individually and in concert, obtained a warrant authorizing Plaintiff's arrest.

188.    In the warrant affidavit, Defendants made false statements, misrepresentations, mischaracterizations, and omissions that created falsehoods, and they did nothing to correct these falsehoods.

189.    Defendants made those false statements or omissions either deliberately, or with a reckless disregard for the truth.

190.    Those false statements, misrepresentations, mischaracterizations, or omissions were material, or necessary, to the finding of probable cause for the arrest warrant.

191.    Defendants then secured Plaintiff's arrest on that warrant.

192.    Defendants' acts and omissions in this regard were the direct and proximate cause of Plaintiff's injuries.

193.    Defendants performed the above-described acts under color of state law intentionally, with reckless disregard for the truth, and with deliberate indifference to Plaintiff's

clearly established constitutional rights.  No reasonable officer would have believed this conduct was lawful.

## COUNT III

**42 U.S.C. § 1983: Malicious Prosecution in Violation of the Fourth Amendment** (against all individual defendants)

194.    Plaintiff incorporates the preceding paragraphs by reference.

195.    Defendants—acting individually, in concert, with malice, and knowing that probable cause did not exist to prosecute Plaintiff for Welles' shooting or any crime—intentionally or recklessly caused Plaintiff to be arrested, charged, and prosecuted for those crimes.

196.    Defendants, acting individually and in concert, fabricated evidence, withheld and misrepresented exculpatory and impeachment evidence, made false or misleading reports to prosecuting authorities, and otherwise interfered with the prosecuting authorities' ability to exercise independent judgment concerning charging.  All of this resulted in Plaintiff's arrest, prosecution, and incarceration without probable cause.

197.    Defendants performed the above-described acts under color of state law intentionally, with reckless disregard for the truth, and with deliberate indifference to Plaintiff's clearly established constitutional rights.  No reasonable officer would have believed this conduct was lawful.

198.    The prosecution finally terminated in Plaintiff's favor on February 29, 2024, when the Philadelphia County Municipal Court permitted the Commonwealth of Pennsylvania to withdraw all charges against Plaintiff.

199.    Defendants' acts and omissions described in the preceding paragraphs were the direct and proximate cause of Plaintiff's injuries, because they knew, or should have known, that

their conduct would result in the wrongful arrest, charging, prosecution, and incarceration of Plaintiff.

## COUNT IV
**42 U.S.C. § 1983: Deprivation of Liberty without Due Process of Law by Fabricating Evidence and Withholding Material Exculpatory and Impeachment Evidence in Violation of the Fourteenth Amendment** (against all individual defendants)

200.    Plaintiff incorporates the preceding paragraphs by reference.

201.    Defendants, acting individually and in concert, deprived Plaintiff of his clearly established rights to due process of law by fabricating evidence, withholding and misrepresenting exculpatory and impeachment evidence, making false or misleading reports to prosecutors, omitting material information from those reports, and otherwise interfering with the prosecutor's ability to exercise independent judgment.

202.    Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Plaintiff's clearly established constitutional rights. No reasonable officer would have believed this conduct was lawful.

203.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Plaintiff's injuries. Defendants knew, or should have known, that their conduct would result in Wilson's wrongful arrest, prosecution, and incarceration.

## COUNT V
**42 U.S.C. § 1983: Civil Rights Conspiracy** (against all individual defendants)

204.    Plaintiff incorporates the preceding paragraphs by reference.

205.    Defendants agreed among themselves to act in concert in order to deprive Plaintiff of his clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable

searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law.

206.    In furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

      a.    Fabricating inculpatory evidence;

      b.    Intentionally or with deliberate indifference failing to comply with their duty to disclose exculpatory and impeachment material;

      c.    Making false or misleading reports to prosecutors, omitting material information from those reports, and otherwise interfering with the prosecutor's ability to exercise independent judgment; and

      d.    Wrongfully arresting and prosecuting Plaintiff while knowing that they lacked probable cause.

207.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Plaintiff's injuries.  Defendants knew, or should have known, that their conduct would result in Plaintiff's wrongful arrest, charging, prosecution, and incarceration.

**COUNT VI**
**42 U.S.C. § 1983: Supervisory Liability** (against Defendants Lawson, Trower, Nowakowski, Step Johnson (Badge No. 351), Kearney, Doyle, and Walsh)

208.    Plaintiff incorporates the preceding paragraphs by reference.

209.    SPD Supervisory Defendants Lawson and Trower were both personally involved in the investigation of Plaintiff and directly supervised the investigative acts taken by Defendants Larson and Carney.

210.    SIG Supervisory Defendants Nowakowski, Step Johnson, and Kearney were both personally involved in the investigation of Plaintiff and directly supervised the investigative acts taken by Defendants Fahy, Mark Johnson, Martella, Getz, Dydak, Little, Somogyi, Jang, Burgos, Kelly, and Gilson.

211.    Homicide Unit Supervisory Defendants Walsh and Doyle were both personally involved in the investigation of Plaintiff and directly supervised the investigative acts taken by Defendant Byard.

212.    The Supervisory Defendants directed their respective subordinates to take the actions that violated Plaintiff's clearly established constitutional rights as described above.

213.    The Supervisory Defendants had actual knowledge of their respective subordinates' violations of Plaintiff's clearly established constitutional rights as described above, and the Supervisory Defendants acquiesced in those violations.

214.    The reckless and deliberately indifferent conduct of the Supervisory Defendants violated their clearly established duties to supervise their respective subordinates, and no reasonable police supervisor would have believed that reckless and deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

215.    The acts and omissions of the Supervisory Defendants, as described in the preceding paragraphs, were the direct and proximate cause of Plaintiff's injuries and damages. The Supervisory Defendants knew, or should have known, that their conduct would result in Plaintiff's wrongful arrest, prosecution, and incarceration.

## COUNT VII

**False Arrest and Imprisonment under Pennsylvania Law** (against all individual defendants)

216.    Plaintiff incorporates the preceding paragraphs by reference.

217.    Acting alone, jointly, and/or in concert and conspiracy, Defendants intentionally, knowingly, maliciously, and/or recklessly seized, arrested, and detained Plaintiff in the absence of reasonable suspicion and probable cause.

218.    Consequently, Defendants seized, arrested, and detained Plaintiff unlawfully.

219.    As a result of this false arrest and imprisonment, Plaintiff sustained the injuries and damages set forth above.

## COUNT VIII

**Malicious Prosecution under Pennsylvania Law** (against all individual defendants)

220.    Plaintiff incorporates the preceding paragraphs by reference.

221.    Acting alone, jointly, and/or in concert and conspiracy, Defendants intentionally, knowingly, maliciously, and/or recklessly caused, initiated, or continued proceedings against Plaintiff without probable cause, and the proceedings ultimately terminated in Plaintiff's favor on February 29, 2024, when all charges against him were withdrawn.

222.    As a result of this malicious prosecution, Plaintiff sustained the injuries and damages set forth above.

## COUNT IX
**Outrageous Conduct Causing Severe Emotional Distress under Pennsylvania Law** (against all individual defendants)

223.    Plaintiff incorporates the preceding paragraphs by reference.

224.    Acting alone, jointly, and/or in concert and conspiracy, Defendants by extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress to Plaintiff.

225.    Defendants' acts or omissions as alleged in the preceding paragraphs constitute the tort of Outrageous Conduct Causing Severe Emotional Distress, all to Plaintiff's great detriment and loss.

226.    As a result of Defendants' conduct, Plaintiff suffered and continues to suffer damages as described above.

## COUNT X
**Civil Conspiracy under Pennsylvania Law** (against all individual defendants)

227.    Plaintiff incorporates the preceding paragraphs by reference.

228.    Acting alone, jointly, and/or in concert and conspiracy, Defendants committed tortious and other unlawful acts against Zaire Wilson, including false arrest, false imprisonment, malicious prosecution, and outrageous conduct causing severe emotional distress.

229.    As a result of Defendants' conduct, Plaintiff suffered and continues to suffer damages as described above.

RELIEF DEMANDED

WHEREFORE, Plaintiff Zaire Wilson respectfully requests that the Court grant the following relief:

A.      A declaratory judgment that Defendants violated Zaire Wilson's rights under the Fourth and Fourteenth Amendments and Pennsylvania law;

B.      An award of compensatory damages against all Defendants in an amount to be determined by the finder of fact;

C.      An award of nominal damages against all Defendants in an amount to be determined by the finder of fact;

D.      An award of punitive damages against all Defendants in an amount to be determined by the finder of fact;

E.      Reasonable attorney's fees and costs; and

F.      Such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Jon Cioschi
/s/ Christina Matthias
/s/ Alan Tauber
Jon Cioschi, Esq.
Christina Matthias, Esq.
Alan Tauber, Esq.
WISEMAN, SCHWARTZ, CIOSCHI, & TRAMA
718 Arch Street, Suite 701 North
Philadelphia, PA 19106
(215) 360-3988
cioschi@wisemanschwartz.com
matthias@wisemanschwartz.com
atauber@atauberlaw.com

January 3, 2026